UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

ELIJAH M. FORD,

                Plaintiff,                Case No. 1:16-cv-243

v.                                    Honorable Janet T. Neff

MICHAEL C. KENNERLY et al.,

                Defendants.

_____/

**OPINION**

        This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Stoddard, Norwood, Huss, Cassel, Butler, King, Edwards, Zwicker, John Doe #1, John Doe #2, John Doe #3, J. Smith, Downing, DeBor, Mygrant, Santiago-Davis, Baitenger, Novack, Lane, Baden, (unknown) RN at Sparrow Ionia (Meshia), Stansby, Sparrow Ionia Hospital, Roots, Guilkey, Preslesnik, Shecter, Roy, E. Smith, and Houser. The Court

will serve the complaint against Defendants K. Nevins, (unknown) Murry, Ray Wilson, Rebecca

Woods, M. Day, J. Harris, (unknown) Moul, (unknown) Vankamann, (unknown) Bourman, Philip

Shroad, (unknown) Zwolensky, Corizon Healthcare Incorporated (Corizon), Michael C. Kennerly,

Richard Czop, Roger Gerlach, (unknown) Behler,  Jody LaBarre, Christy Jastifer, JoAnn Bounting,

Betty J. Kemp, K. Siglar, Karen Ibarra, Harriet Squier, Erin Olebeke, and Timothy Kangas.

## Discussion

### I.    Factual allegations

Plaintiff is incarcerated with the Michigan Department of Corrections (MDOC).  He

is currently housed at the Marquette Branch Prison (MBP) in Marquette, Michigan.  The events that

form the basis for his complaint occurred while he was housed at the Ionia Correctional Facility

(ICF) in Ionia, Michigan. Most of the Defendants Plaintiff sues are employed at ICF.  Plaintiff sues

Warden John Preslesnik; Acting Warden Catherine Stoddard; Deputy Wardens Nannette Norwood

and Erica Huss; Resident Unit Manager Harold L. Guilkey; Assistant Resident Unit Supervisor Eric

Smith; Captain (unknown) Cassel; Lieutenants D. Butler, Christopher King, and K. Edwards;

Sergeants K. Nevins, (unknown) Murry, Philip Shroad, M. Day, (unknown) Zwicker, and (unknown)

Zwolensky; Corrections Officers Ray Wilson, Rebecca Woods, Jeremy Smith, J. Downing, J. Harris,

(unknown) Moul, (unknown) Vankamann, (unknown) Bourman, Beth DeBor, (unknown) Mygrant,

(unknown) Santiago-Davis, (unknown) Baitenger, John Doe #1, John Doe #2, John Doe #3, J. Kerr,

and Brian Houser; Health Services Unit personnel Physician Assistant Michael C. Kennerly, Dr.

Richard Czop, Dr. Roger Gerlach, Dr. (unknown) Behler, Health Unit Manager Jody LaBarre, Nurse

Christy Jastifer, Nurse JoAnn Bounting, Nurse Betty J. Kemp, Nurse K. Siglar, and Nurse Karen

Ibarra; Librarian Joseph Novack; and Transfer Coordinator John Doe #4.   Plaintiff also sues

Defendants from outside ICF including Sparrow Ionia Hospital and its health care providers: Dr. Kaleb A. Lane, Dr. Eric Stansby, Nurse Wendy Baden, and Nurse Meshia (unknown); Corizon and its health care providers Dr. Harriet Squier, Dr. Erin Orlebeke, and Dr. Timothy Kangas; and Roy, Schecter & Vocht P.C. attorneys Lynn H. Schecter, William A. Roy, and John Doe #5.

Plaintiff also identifies four additional John Doe Defendants (referenced herein as John Does ##6-9) that were assigned to ICF. (ECF No. 1, PageID.12.)  He puts them in the general category of "staff, personnel, corrections officers, and health services[.]"  (*Id.*)  It appears that two of these Defendants, John Doe #6 and John Doe #7, were corrections officers who were ordered to "shake down" Plaintiff's cell on March 4, 2013.  (ECF No. 1-2, PageID.118.)  Finally, Plaintiff references four unknown state officials (referenced herein as John Does ##10-13).  (*Id.*, PageID.16.)

Plaintiff's complaint is a far cry from the "short and plain statement of the claim" mandated by Federal Rule of Civil Procedure 8.  It spans one hundred ninety pages, includes claims against more than sixty Defendants, and offers nearly five hundred pages of exhibits.  The complaint presents an account, sometimes a day-by-day account, of Plaintiff's final fifteen months at ICF. Despite the length of Plaintiff's complaint the factual account it provides could not be described as detailed.  Instead, the complaint is characterized by hopelessly repetitive statements of labels and conclusions.

Plaintiff separates his complaint into several sections.  In one section (ECF No. 1, PageID.3-16) he simply identifies the defendants; in another he sets out his legal claims defendant by defendant (ECF No. 1, PageID.129-170) .  In between those sections (ECF No. 1, PageID.17-128) he provides a roughly chronological account of the facts underlying his claims, beginning in July of 2012. The remaining allegations in the complaint detail his attempts at exhaustion of

administrative remedies (ECF No. 1-3, PageID.171-85) and his requests for relief (*Id.*, PageID.186-90).

Until July 25, 2012, Plaintiff had the benefit of a special accommodation shoe detail that permitted him to wear (apparently at state expense) deep toebox soft shoes. Based on the allegations in the complaint, as supplemented by Plaintiff's statements in the grievances he attaches as exhibits, during a July 25 healthcare visit with Defendant Michael Kennerly, a physician's assistant at ICF, Plaintiff requested that the accommodation be changed from the deep toebox soft shoe to an athletic shoe. Defendant Kennerly removed Plaintiff from the deep toebox shoe accommodation but concluded that Plaintiff's condition did not permit him to obtain the athletic shoe at state expense. Accordingly, Defendant Kennerly directed Plaintiff to obtain athletic shoes and arch supports at his own expense.

Plaintiff alleges that on the same day Defendant Nurse Christy Jastifer, under the order of Defendant Kennerly, refused to remove Plaintiff's big toenail from his severely injured right foot. Plaintiff states that he was forced to remove the toenail himself and that he suffered extreme pain. Plaintiff links his foot injury to Defendant Kennerly's decision to discontinue Plaintiff's shoe accommodation, but his complaint indicates the decision to end the accommodation and the swollen right foot that required removal of the toenail occurred on the same day. Plaintiff also offers the conclusory statement that on September 10, 2012, Defendant Jody LeBarre, the ICF Health Unit Manager, joined Defendants Kennerly and Jastifer in denying Plaintiff medical treatment for his foot. Plaintiff offers no facts, however, to explain what happened on September 10 that might constitute the denial of medical treatment.

-4-

Plaintiff jumps from September 10, 2012, to January 28, 2013. On that date, according to Plaintiff, Defendant Ray Wilson, a corrections officer, began a campaign of harassment against Plaintiff that was motivated by racial animus and retaliation for Plaintiff's filing of grievances and kites. The campaign of harassment took many forms.

On January 28, 2013, Plaintiff states that Defendant Wilson did the following: (1) destroyed all but one of four telephones on the unit-4 recreation yard; (2) informed Plaintiff that he did not deserve to use the telephones on Defendant Wilson's yard because he was not white; and (3) threw snowballs and rocks at other prisoner's windows from the unit-4 recreation yard. Plaintiff suggests that Defendant Wilson denied Plaintiff time on the yard and that Defendant (unknown) Zwicker acquiesced in that denial to prevent Plaintiff from calling his uncle, an attorney. Plaintiff also notes that he submitted a kite to Defendant Stoddard about Wilson's improper conduct and, for that reason, Defendant Wilson subsequently retaliated against him.

On March 2, 2013, Plaintiff injured his shoulder while playing basketball on the unit-4 recreation yard. He sought the assistance of Defendant Beth DeBor, the unit-4 yard corrections officer. She instructed him to go inside and inform the panel officer, who happened to be Defendant Wilson, to contact health services and to send Plaintiff to health services. Plaintiff did as he was told, but Defendant Wilson refused to assist. Defendant Wilson told Plaintiff: "I ain't calling nobody for you, write your little rat kite to the warden and tell her to call healthcare for you, you snitch." (ECF No. 1, PageID.21.) Plaintiff returned to the yard and again asked Defendant DeBor to help. She closed the yard and contacted health services for Plaintiff. Plaintiff indicates that he was cleared to receive medical attention 30 to 45 minutes after the injury occurred.

Plaintiff was transported from ICF to the Emergency Room at Defendant Ionia Sparrow Hospital Corp. by Defendant A. Baitenger and Defendant (unknown) Mygrant, corrections officers.  At the hospital, Plaintiff was examined by Defendant Nurse Wendy Baden, Defendant Nurse Meshia (unknown), and Defendant Dr. Kaleb Lane.  Defendant Lane diagnosed a shoulder dislocation.  The only medication prescribed by Defendant Lane was ibuprofen.[1]  Defendant Lane also prescribed an arm brace.  Defendants Mygrant and Baitenger informed Defendant Lane that the arm brace would not be permitted at ICF.  Defendants Lane, Baden, and Nurse Meshia instead provided Plaintiff with ace bandages and a sling.  Defendant Lane recommended that Plaintiff be seen by an orthopedic specialist and that he be returned to the emergency room if his condition worsened.

Health care services personnel saw Plaintiff on March 3, 4 and 5.  Plaintiff complains that when he saw Defendant Kennerly on March 5, that Kennerly made an unjust medical decision to stop the Ultram prescription.  The record submitted by Plaintiff, however, indicates that the Ultram was only prescribed for three days.  Although Defendant Kennerly did not renew the prescription on March 5, he did not discontinue it either.  Instead he prescribed ibuprofen and ice packs.

Plaintiff's continued treatment at ICF revealed either a different or additional problem.  Plaintiff underwent additional x-rays on March 6.  Defendant Kennerly and Defendant Dr. (unknown) Behler, a visiting physician, reported that Plaintiff had suffered a shoulder separation, an entirely different injury than a shoulder dislocation.  (ECF No. 1-4, PageID.220-221.)  Although

---

[1]Plaintiff alleges that Defendant Lane prescribed pain medication (Ultram) but the medical record attached to his complaint indicates otherwise.  The Ultram was prescribed by the Defendant Dr. Roger Gerlach at ICF.  (ECF No. 1-4, PageID.195-196.)  The prescription was only written to cover the three-day period beginning March 2 and ending March 4.  (*Id*.)

Plaintiff suggests this was simply a ploy, some sort of lesser diagnosis to justify a less aggressive treatment regimen, he offers nothing to support that conclusion. The separation was described as a suspected Grade 3 separation. (ECF No. 1-4, PageID.222.) Plaintiff contends this was also an attempt to minimize his injury because it could have actually been a higher grade of separation. The materials Plaintiff submits along with his complaint, however, indicate that a Grade 3 separation is quite severe and can require surgery. (ECF No. 1-4, PageID.242-243.)

When Defendant Kennerly examined Plaintiff again a week later, he recommended a referral to an orthopedic specialist. (ECF 1-4, PageID.223-224.) The referral was rejected as medically unnecessary by Defendant Dr. Harriet Squier. (ECF 1-4, PageID.225-226.) Plaintiff alleges that the consultation request was prepared by Defendant Ibarra, but based on the medical record he has supplied it appears the rejection was documented by Defendant Ibarra, not the request. Defendant Squier noted that Grade 3 shoulder separations should be managed conservatively. (*Id.*) Defendant Kennerly and other health services personnel at ICF (including Defendants Kemp, Czop, Jastifer, Siglar, and Gerlach)[2] continued to examine and treat Plaintiff's shoulder thereafter following the conservative management protocol recommended by Defendant Squier. Plaintiff contends that this course of management for his shoulder was completely inadequate and caused him to suffer extreme pain. Plaintiff further contends that the inadequate care was retaliatory for his filing of grievances regarding his medical care.

---

[2]Defendant Czop was Plaintiff's principal treating doctor at ICF through early April, 2013. Thereafter, Defendant Gerlach filled that role. (ECF No. 1-1, PageID.61-64.) Plaintiff also names Defendant Nurse Joann Bounting, but it is not clear from the record what role she played in providing care to Plaintiff. The complaint suggests that she did not like Plaintiff because his uncle's complaints caused her trouble (ECF No. 1-1, PageID.47), that she did not follow written policy (*Id.*), and that Defendant Czop acted jointly and in concert with her and several other Defendant in denying Plaintiff adequate medical care (*Id.* at PageID.62), but it never indicates that she examined Plaintiff, treated Plaintiff, or consulted with the other Defendants in providing treatment to Plaintiff.

Plaintiff was denied the opportunity to shower by Defendant Wilson on March 19 and 20. On March 23, 2013, Defendant Wilson "shook down" Plaintiff's cell destroying court documents, transcripts, and records and exhibits for a lawsuit, all in retaliation for Plaintiff's contact with his uncle, an attorney, with respect to the mistreatment of Plaintiff. On March 24, 2013, Defendants Wilson, Moul, Murry, and Bourman, joined together to deny Plaintiff his recreational yard time and his shower. Defendant Murry informed Plaintiff "You brought this attention and treatment on yourself. You shouldn't be snitching on Officer (Defendant Ray) Wilson, and filing grievances, next time you'll know . . .." (ECF No. 1-1, PageID.38.) On March 26, 2013, Defendant Wilson denied Plaintiff his recreational yard time and his shower.

Plaintiff also complains that he sought the assistance of Defendant Houser on March 26, 2013, and Defendant Day on March 27, 2013. Defendant Houser called health services three times on Plaintiff's behalf. Health services informed Defendant Houser, and then Houser informed Plaintiff, that health services personnel were aware of Plaintiff's injury, that he was receiving medication for the pain, and that he was scheduled to see the doctor soon. Defendant Day, on the other hand, refused to contact health services on Plaintiff's behalf.

On March 29, 2013, Plaintiff complained to Defendant Roots, a mental health case worker, that Defendant Officers Wilson, Murry, Moul, Bourman, and Vankamann, had threatened Plaintiff with harm from other inmates or by setting him up for false misconduct charges because Plaintiff "love[d] writing grievances." (ECF No. 1-1, PageID.48.) Defendant Roots informed Plaintiff she could not help him because she had "no say over custody." (*Id*.) On March 31, 2013, Defendant Officer Woods sexually harassed Plaintiff while he was on the recreation yard by requiring him to unzip his coat and pull up his shirt. She then threatened Plaintiff: "Keep writing

grievances on my friends and you'll receive way worse treatment, believe me my co-workers will do anything I ask, just ask around."  (ECF No. 1-1, PageID.50.)

Plaintiff also complains that Defendant Sergeant Shroad interfered with his care on April 19, 2013.  Plaintiff notes that Defendant Shroad's stated motivation was retaliation:

> I've had it with your whinning [sic] and writing your little grievances complaining, grievances you've been writing on my co-workers like Officer Woods . . . and other staff . . . I've injured my shoulder before and I know how painful it can be. So for now on, you will not wear your arm in that sling under your shirt or your sling under your coat.  I want to see the sling at all times or you will receive a ticket (major misconduct), this'll teach you about filing grievances on my staff.

(ECF No. 1-1, PageID.65.)  Defendant Shroad informed Plaintiff that this requirement had been approved by Defendant LaBarre, ICF Health Unit Manager.

On April 20, 2013, Defendant Wilson, along with Defendants Murry,  John Doe #1, John Doe #2, and John Doe #3, arrived on the scene after Plaintiff had fallen in the shower and was unable to get up on his own.  According to Plaintiff, Defendant Murry instructed the other Defendants to leave Plaintiff on the floor while she confirmed by way of videotape that Plaintiff had actually fallen at which point she would contact healthcare.  Defendant Murry told Plaintiff "And it's funny that you expect me to help you after you've been writing [expletive deleted] grievances on my staff and I.  I'll remember that as I take my time going up to control center, you lay there and think about that."  (ECF No. 1-1, PageID.74.)  Plaintiff states that he was forced to lie on the wet shower floor among various bacterial diseases and human wastes.  Plaintiff states that Defendants Wilson and Doe #1, Doe #2, and Doe #3, not only refused to help him up, but also proceeded to spout race-based inappropriate comments and insults.  Defendants John Doe #1 and John Doe #3 and Corrections Officer Torrance assisted Plaintiff in dressing himself as he was on the floor.  (ECF No. 1-1, PageID.70,78.)  No medical care was provided until Defendant Nurse K. Siglar arrived

from health services.  Plaintiff estimates he was subjected to abuse from the Defendants for one-half hour to one hour.

Following Plaintiff's fall in the shower on April 20, 2013, Defendants Santiago-Davis and Baitenger transported him to Ionia Sparrow Hospital.  Plaintiff was examined in the Sparrow emergency room by Defendant Dr. Eric Stansby.  Plaintiff states that Dr. Stansby informed him that his shoulder required surgery and an arm brace.  Neither requirement is stated in the medical record of his visit to the emergency room.

When Plaintiff returned to ICF he continued to pursue treatment for his shoulder. Defendant Gerlach encouraged Plaintiff to forget about surgery and, instead, to do strengthening exercises on his own.  Defendant Gerlach instructed Plaintiff to discontinue use of the sling. Defendant Gerlach also sought approval for physical therapy for Plaintiff.  That request was rejected, again by Defendant Squier.  She encouraged giving the injury another 3 months to heal and holding off on physical therapy until Plaintiff's pain level had decreased.  (ECF No. 1-4, PageID.257-258.)  That is the course of treatment Plaintiff's health care providers followed over the rest of his time at ICF.

The day after his fall in the shower, Plaintiff filled out an incident report regarding his fall and the conduct of the corrections officers.  Defendant Murry altered the report, at the instruction of Defendant Captain (unknown) Cassel, to remove information that properly belonged in a grievance rather than an incident report.  She then presented the altered document to Plaintiff for signature. He refused to sign. Defendant Murry took Plaintiff's original incident report from him under threat of force.

-10-

Plaintiff contends that Defendant Murry took the unlawful and retaliatory action of "falsifying" the report[3] jointly and in concert with Defendant Cassel, Defendant Deputy Warden Huss, Defendant Deputy Warden Norwood, Defendant Warden Stoddard, and Defendant Lieutenant King.[4]  Plaintiff later adds Defendant Residential Unit Manager Guilkey to the list of responsible parties.  The same day that Defendant Murry falsified the report, Defendant Wilson apologized for his April 20 misconduct.  The same day, Defendant Shroad continued to retaliate against Plaintiff by requiring him to eat in the dining area, despite the severe pain Plaintiff endured because of his injuries, rather than permitting him to eat in his cell.

Plaintiff alleges that on May 2, 2013, Defendant Officer Downing wrote a false misconduct report against Plaintiff to the effect that Plaintiff had permitted another prisoner to use Plaintiff's personal telephone pin number.  Plaintiff states that Defendant Downing took this action because Defendants Wilson, Murry, Smith and others had informed Defendant Downing that Plaintiff was a grievance-filing rat.  Plaintiff notes that Defendant Downing effectively stopped Plaintiff from contacting his attorney/uncle with the misconduct report.

Plaintiff alleges that on May 8, 2013, Defendant Joseph Novack, librarian, wrote a false misconduct ticket against Plaintiff for insolence.  Plaintiff also states that Defendant Novack threatened to write a ticket for Plaintiff's use of the libarary typewriter to type grievances.

---

[3]Plaintiff alleges that Defendant Murry filed a "falsified" report.  It is not clear from his allegations, however, whether the report as filed was false or, from Plaintiff's perspective, simply incomplete because it did not include his allegations of improper treatment at the hands of the Defendants.

[4]Plaintiff's complaint lacks detail with regard to the nature of these Defendants' participation in the alleged wrong; however, based on the documents attached to Plaintiff's complaint, it appears that each Defendant failed to adequately respond when Plaintiff objected to Defendant Murry's misconduct by way of kite or grievance.

Plaintiff alleges that on May 19, 2013, Defendant Downing, in retaliation for Plaintiff's writing of grievances, wrote another false misconduct ticket against Plaintiff. This ticket also accused Plaintiff of permitting another prisoner to use Plaintiff's personal telephone pin number. Defendant King found Plaintiff "not guilty" of the offense on May 22.

Upon returning from the May 22 hearing, Defendant Wilson humiliated, degraded, and embarassed Plaintiff by grabbing and fondling Plaintiff's buttocks during an alleged "shakedown." Plaintiff reported the incident to Defendant Lieutenant Butler who, Plaintiff alleges, informed Defendant Wilson. Plaintiff also alleges that Defendant Vankamann placed Plaintiff's life in danger that day by calling Plaintiff a "rat" in the presence of other prisoners. Plaintiff states he was shortly thereafter transferred to a different unit. Plaintiff contends that his transfer was just another attempt by Defendants Stoddard, Huss, Norwood and Nevins to sweep unconstitutional conduct under the rug.

On June 27, 2013, Defendant Officer Harris wrote a false misconduct ticket against Plaintiff in retaliation for Plaintiff's grievances against Defendant Harris' friends. Plaintiff reports that Defendant Harris stated: "You better watch out Ford, you're never going to win against us . . . . I've been hearing you've been lying writing [expletive deleted] grievances trying to get a couple of my friends, I mean co-workers, in trouble. Just know this Ford, when I write tickets they stick even when I lie." (ECF No. 1-2, PageID.109.) On July 5, Defendant Sergeant Zwolensky, upon reviewing the ticket authored by Defendant Harris, told Plaintiff that he was aware of all the grievances and that Plaintiff would not be there long if he continued to write grievances. On July 12, 2013, Defendant Cassel joined the expanding conspiracy against Plaintiff when he found Plaintiff "not guilty" of the ticket Defendant Harris had written. Plaintiff states that Defendant

Cassel informed Plaintiff that he made the "not guilty" finding to make up for the "falsified" incident report filed by Defendant Murry.

On July 24, 2013, Defendant Officer J. Smith wrote a false misconduct ticket against Plaintiff for disobeying a direct order.  Plaintiff indicates that Defendant J. Smith wrote the ticket in retaliation for Plaintiff's rejection of Smith's overfamiliar conduct and for Plaintiff's grievances against Smith's friends.   Plaintiff further states that Defendant J. Smith threatened Plaintiff with physical harm by other prisoners if Plaintiff continued to write grievances.

Plaintiff was found guilty on the major misconduct ticket written by Defendant J. Smith by Defendant Butler.  Plaintiff contends that he was denied due process in connection with the hearing because Defendant Day refused to provide Plaintiff a complete copy of the investigation report.

On August 22, 2013, Defendant Inspector Nevins unlawfully continued Plaintiff's Security Threat Group (STG)[5] designation based on Plaintiff's alleged membership in or affiliation with the Gangster Disciples.[6]  With this action, Plaintiff alleges, Defendant Nevins joined the conspiracy between Defendants Stoddard, Preslesnik, Huss, Norwood, Butler, King, Edwards, Murry, E. Smith, Shroad, Day, J. Smith, Zwicker, Zwolensky, Wilson, Woods, Downing, Harris,

---

[5]An STG is defined under MDOC Policy as "a group of prisoners designated by the Director as possessing common characteristics which distinguish them from other prisoners or groups of prisoners and which, as a discrete entity, poses a threat to staff or other prisoners or to the custody and security of the facility." Mich. Dep't of Corr. Policy Directive 04.04.113(A).  The policy provides for a Central Officer STG Coordinator.  In addition, the warden of each facility appoints a local STG coordinator for the institution.  PD 04.04.113(D)-(E).  A prisoner may be designated an STG I by the local STG Coordinator if there is sufficient documentation of the prisoner's membership in the STG and the prisoner fails to make a credible renunciation of his membership.  PD 04.04.113(O).  The Central Officer STG Coordinator makes the final determination on designating a prisoner as an STG member. PD 04.04.113(Q).

[6]Although Plaintiff notes that August 22, 2013 is a specific date upon which Defendant Nevins took action to unlawfully continue Plaintiff's STG designation, he references actions by Defendant Nevins beginning in 2011 and continuing through October, 2013.

Novack, Vankamann, Moul, and Bourman.  Defendant Nevins' reasons for joining the conspiracy include a grievance Plaintiff had previously filed against Nevins, racism, and Nevins' personal dislike for Plaintiff's brother Joshua.  Plaintiff reports that Nevins told Plaintiff: "the only reason white guys are getting off STG is because they're doing the right thing and all you non-white guys just want to be gangbang thugs.  My guess is you should start hanging with more white guys maybe you'll get off STG, maybe not."  (ECF No. 1-2, PageID.139.)  Defendant Nevins also told Plaintiff: "if [you] wouldn't of [sic] filed grievances or contacted a supervisor . . . you might have gotten off STG."  (*Id.*)

Plaintiff states that Defendant Nevins is continuing Plaintiff's STG designation based on false information.  Plaintiff alleges that Defendant Nevins, on March 4, 2013, authorized Defendants John Doe #6, John Doe #7, Kerr, and Day to routinely shake down Plaintiff's cell.  The Defendants took from Plaintiff five pieces of paper which they say constitute threatening gang material. Plaintiff states that because of the improper STG designation he: (1) cannot complete the program requirements that would make him eligible for release on his earliest release date; (2) is housed in facilities a great distance from his family; and (3) suffers from a variety of mental health problems.

Finally, Plaintiff alleges that Defendant Guilkey joined the list of conspirators identified above, as did Transfer Coordinator John Doe #4, when he failed to cure the wrongful actions of others detailed herein.

Plaintiff makes no allegations that cover the period subsequent to his transfer to MBP in October of 2013.  The documents he attaches to his complaint, however, include treatment notes relating to his shoulder through September of 2014 (ECF No. 1-9, PageID.617-650).

-14-

II.     Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr.*

-15-

*Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  Because § 1983 is a method for vindicating federal

rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify

the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

A.      No allegation

Plaintiff identifies three attorneys, Defendants Shecter, Roy, and John Doe #5 (ECF

No. 1, PageID.14), but never makes any factual allegations with respect to their conduct.  Where a

person is named as a defendant without an allegation of specific conduct, the complaint is subject

to dismissal, even under the liberal construction afforded to *pro se* complaints.  *See Frazier v.*

*Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing the plaintiff's claims where the

complaint did not allege with any degree of specificity which of the named defendants were

personally involved in or responsible for each alleged violation of rights); *Griffin v. Montgomery*,

No. 00-3402, 2000 WL 1800569, at *2 (6th Cir. Nov. 30, 2000) (requiring allegations of personal

involvement against each defendant)); *Rodriguez v. Jabe*, No. 90-1010, 1990 WL 82722, at *1 (6th

Cir. June 19, 1990) ("Plaintiff's claims against those individuals are without a basis in law as the

complaint is totally devoid of allegations as to them which would suggest their involvement in the

events leading to his injuries."); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *Krych*

*v. Hvass*, 83 F. App'x 854, 855 (8th Cir. 2003); *Potter v. Clark*, 497 F.2d 1206, 1207 (7th Cir.

1974); *Williams v. Hopkins*, No. 06-14064, 2007 WL 2572406, at *4 (E.D. Mich. Sept. 6, 2007);

*McCoy v. McBride*, No. 3:96-cv-227RP, 1996 WL 697937, at *2 (N.D. Ind. Nov. 5, 1996); *Eckford-*

*El v. Toombs*, 760 F. Supp. 1267, 1272-73 (W.D. Mich. 1991).  Plaintiff's complaint fails to provide

these Defendants fair notice of Plaintiff's claims against them or the grounds upon which those

claims rest.  Plaintiff's claims against Defendants Schecter, Roy, and John Doe #5 are, therefore, properly dismissed.

B.      No federal right

Plaintiff's complaint is rife with allegations that one or more Defendants acted in violation of MDOC policy or obligations under state law.  Any Defendant's alleged failure to comply with an administrative rule or policy does not itself rise to the level of a constitutional violation.  *Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007); *Brody v. City of Mason*, 250 F.3d 432, 437 (6th Cir. 2001); *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992); *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992); *McVeigh v. Bartlett*, No. 94-23347, 1995 WL 236687, at *1 (6th Cir. Apr. 21, 1995) (failure to follow policy directive does not rise to the level of a constitutional violation because policy directive does not create a protectible liberty interest). Section 1983 is addressed to remedying violations of federal law, not state law.  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982); *Laney*, 501 F.3d at 580-81.  Claims for violation of MDOC policy or state law are properly dismissed.

C.      No state actor

In order for a private party's conduct to be under color of state law, it must be "fairly attributable to the State."  *Lugar*, 457 U.S. at 937; *Street*, 102 F.3d at 814.  There must be "a sufficiently close nexus between the State and the challenged action of [the defendant] so that the action of the latter may be fairly treated as that of the State itself."  *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 102 (6th Cir. 1991) (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).  A private company that performs a public function, such as contracting with the state to provide all medical care to prisoners, may be found to act under color of law for purposes of § 1983. *See, e.g., Street,*

102 F.3d at 814.  Accordingly, Plaintiff's allegations with respect to Corizon and its employees are fairly attributable to the State.

Plaintiff's allegations with respect to Defendants Sparrow Ionia Hospital, Dr. Kaleb A. Lane, Dr. Eric Stansby, Nurse Wendy Baden, and Nurse Meshia (unknown), do not establish the necessary nexus.  The fact that Defendant Sparrow Ionia Hospital may receive some public funding and that both the hospital and the doctor are licensed by the state does not render them "state actors" for purposes of § 1983.  *See Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982) (nonprofit, privately operated school's receipt of public funds did not make its employee discharge decisions acts of state subject to suit under federal statute governing civil action for deprivation of rights); *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006) (allegation that hospital and social worker were subject to state licensing was insufficient to support finding that defendants were acting under color of state law); *Adams v. Vandemark*, 855 F.2d 312, 315-16 (6th Cir. 1988) (fact that nonprofit corporation was funded almost entirely by public sources, and was subject to state regulation, without more, is insufficient to make private entity's decision to discharge employees attributable to state for purpose of § 1983 action).  Further, even if Defendants treated Petitioner at the state's request and expense, they did not thereby become state actors. *See Rendell-Baker*, 457 U.S. at 841 ("private contractors do not become the acts of the government by reason of their significant or even total engagement in performing public contracts"); *Styles v. McGinnis*, 28 Fed. App'x 362, 364 (6th Cir. 2001) ("We agree with the district court that [emergency room doctor] Dr. Gosling did not become a state actor.").  Plaintiff's claims against Defendants Sparrow Ionia Hospital, Dr. Kaleb A. Lane, Dr. Eric Stansby, Nurse Wendy Baden, and Nurse Meshia (unknown) are properly dismissed for failure to allege state action.

D.      Vicarious liability

As explained in detail below, for many of Plaintiff's claims he has alleged that a particular Defendant has taken some action that violated Plaintiff's constitutional rights.  From that core, however, Plaintiff alleges that many other Defendants are liable for the particular Defendant's actions because the Defendants are related as co-conspirators or because one Defendant supervises another.  Plaintiff's allegations of such vicarious liability fail to state a claim.

1.      Conspiracy

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action."  *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)).  The plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff.  *Hensley*, 693 F.3d at 695; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011)  Moreover, a plaintiff must plead a conspiracy with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

Plaintiff's allegations of conspiracy are conclusory and speculative.  In virtually every instance, Plaintiff simply alleges that when a Defendant acted, he acted jointly and in concert with a host of other Defendants.  He provides no factual support.

His allegations, even viewed in the light most favorable to Plaintiff, at best describe a number of discrete facts that occurred over a period of time involving numerous individual officers.  Plaintiff has provided no allegations establishing a link between the alleged conspirators or any agreement between them.  He relies entirely on a highly attenuated inference from the mere fact that he has been disciplined by or subjected to objectionable treatment by a variety of prison officials in various circumstances with which he disagreed.  As the Supreme Court has held, such allegations, while hinting at a "possibility" of conspiracy, do not contain "enough factual matter (taken as true) to suggest that an agreement was made."  *Twombly*, 550 U.S. at 556.  Instead, the Court has recognized that although parallel conduct may be consistent with an unlawful agreement, it is insufficient to state a claim where that conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed . . . behavior." *Iqbal*, 556 U.S. at 680.  In light of the far more likely possibility that the various incidents occurring over the history of Plaintiff's incarceration were unrelated, Plaintiff fails to state a plausible claim of conspiracy.

### 2.  Respondeat superior

For some Defendants Plaintiff alleges they are vicariously liable as supervisors.  For example, Plaintiff claims that several Defendants are liable for violating his constitutional rights because failed to conduct an investigation in response to his grievances, kites, or other complaints or failed to stop a subordinate from violating Plaintiff's rights.  Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).  A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532

F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

### 3.    Specific Defendants

By way of example, Plaintiff complains that Defendant Murry violated his constitutional rights when she "falsified" the incident report relating to Plaintiff's fall in the shower. Plaintiff alleges that Defendant Stoddard is liable for the falsification because Plaintiff sent her a kite about the issue and responded to a grievance about the issue yet she failed to take any action to correct it. Such an allegation is insufficient to establish supervisory liability. Plaintiff also alleges that Defendant Stoddard is liable because she is part of a conspiracy that includes Defendant Murry.[7] The allegations regarding the conspiracy, however, are so conclusory and lacking in detail that Plaintiff has failed to state a conspiracy claim.

Similarly, Plaintiff alleges that  Defendant Guilkey is part of a parallel conspiracy against Plaintiff and that he "failed to cure all wrong doings and unlawful acts and actions that the [co-conspirator] Defendants were committing on a daily basis . . . ." (ECF No. 1-2, PageID.126.)

---

[7]Plaintiff contends that Defendants Huss, Norwood, LeBarre, King, Cassel, and Murry joined Defendant Stoddard in the conspiracy relating to the incident report.

Plaintiff makes the same sort of insufficient allegations with regard to the conspiracy centered on Defendant Nevins and the continuation of Plaintiff's STG designation.  (ECF No. 1-2, PageID.116.)

None of Plaintiff's vicarious liability allegations (conspiracy or supervisory) suffice to state claims against any person other than the actor who is accused of directly violating Plaintiff's constitutional rights.  All such vicarious liability claims are properly dismissed.  Moreover, because Plaintiff raises only vicarious liability claims against Defendants Stoddard, Norwood, Huss, Guilkey, Preslesnik, John Doe #4 (Transfer Coordinator), Eric Smith, and John Does ##8-13, those Defendants are properly dismissed.

E.      Late claims

State statutes of limitations and tolling principles apply to determine the timeliness of claims asserted under 42 U.S.C. § 1983.  *Wilson v. Garcia*, 471 U.S. 261, 268-69 (1985).  For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years.  *See* MICH. COMP. LAWS § 600.5805(10); *Carroll v. Wilkerson*, 782 F.2d 44, 44 (6th Cir. 1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2, 1999).  Accrual of the claim for relief, however, is a question of federal law.  *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996); *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1984).  The statute of limitations begins to run when the aggrieved party knows or has reason to know of the injury that is the basis of his action.  *Collyer*, 98 F.3d at 220.[8]

_____

[8] 28 U.S.C. § 1658 created a "catch-all" limitations period of four years for civil actions arising under federal statutes enacted after December 1, 1990.  The Supreme Court's decision in *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004), which applied this federal four-year limitations period to a suit alleging racial discrimination under § 1981 does not apply to prisoner claims under 28 U.S.C. § 1983 because, while § 1983 was amended in 1996, prisoner civil rights actions under § 1983 were not "made possible" by the amended statute.  *Id.* at 382.

Plaintiff's allegations regarding the failure of Defendants Kennerly, Jastifer, and LaBarre to provide adequate medical treatment for his feet and a special shoe detail is untimely. He asserts claims arising in July and September of 2012. Similarly, Plaintiff's allegations against Defendant Wilson and Defendant Zwicker regarding their conduct on January 28, 2013 (destruction of the telephones on the yard, throwing rocks and snowballs at prisoners' windows, and denying Plaintiff his time in the yard) are untimely. Plaintiff had reason to know of the "harms" done to him at the time they occurred. Hence, his claims accrued in 2012 or January, 2013. Nonetheless, Plaintiff's complaint was filed on February 26, 2016,[9] past Michigan's three-year limit. Moreover, Michigan law no longer tolls the running of the statute of limitations when a plaintiff is incarcerated. *See* MICH. COMP. LAWS § 600.5851(9). Further, it is well established that ignorance of the law does not warrant equitable tolling of a statute of limitations. *See Rose v. Dole*, 945 F.2d 1331, 1335 (6th Cir. 1991); *Jones v. Gen. Motors Corp.*, 939 F.2d 380, 385 (6th Cir. 1991); *Mason v. Dep't of Justice*, No. 01-5701, 2002 WL 1334756, at *2 (6th Cir. June 17, 2002).

A complaint "is frivolous where it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint may be dismissed as frivolous if it is time-barred by the appropriate statute of limitations. *See Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001). The Sixth Circuit has repeatedly held that when a meritorious affirmative defense based upon the applicable statute of limitations is obvious from the face of the complaint, *sua sponte* dismissal of the complaint is appropriate. *See Dellis*, 257 F.3d at 511; *Beach v. Ohio*, No. 03-3187, 2003 WL 22416912, at *1 (6th Cir. Oct. 21, 2003); *Castillo v. Grogan*, No. 02-5294,

---

[9]Plaintiff's complaint is deemed filed when it is handed to prison officials for mailing. *Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008). Absent contrary evidence, a prisoner's complaint is considered to be handed over to prison officials on the date he or she signed the complaint. *Id.* (citing *Goins v. Saunders*, 206 F. App'x 497, 498 n.1 (6th Cir. 2006)). Plaintiff signed his complaint on February 26, 2016.

2002 WL 31780936, at *1 (6th Cir. Dec. 11, 2002); *Duff v. Yount*, No. 02-5250, 2002 WL 31388756, at *1-2 (6th Cir. Oct. 22, 2002); *Paige v. Pandya*, No. 00-1325, 2000 WL 1828653 (6th Cir. Dec. 5, 2000).  Accordingly, Plaintiff's claim regarding his shoes and his claim regarding the conduct of Defendant Wilson on January 28, 2013, must be dismissed as frivolous.

F.      Fourteenth Amendment

Plaintiff claims the Defendants have violated his Fourteenth Amendment rights in two respects: they have denied him equal protection of the laws on the basis of his race and they have deprived him of liberty and property without due process.

1.      Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike.  U.S. CONST., amend. XIV; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  When a law adversely impacts a "suspect class" such as one defined by race, alienage, or national origin, or invades a "fundamental right" such as speech or religious freedom, the rigorous "strict scrutiny" standard ordinarily governs, whereby such laws "will be sustained only if they are suitably tailored to serve a compelling state interest."  *City of Cleburne*, 473 U.S. at 440.  However, while a convicted prisoner does not forfeit all constitutional protections by virtue of his confinement, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights . . . ."  *Price v. Johnston*, 334 U.S. 266, 285 (1948).  "The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives – including deterrence of crime, rehabilitation

-24-

of prisoners, and institutional security." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citing, *inter alia*, *Turner v. Safley*, 482 U.S. 78, 84 (1987)).

To establish a violation of the Equal Protection Clause, an inmate must show that the defendants purposefully discriminated against him. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Such discriminatory purpose must be a motivating factor in the actions of the defendants. *Id.* at 265-66. "A plaintiff presenting a race-based equal protection claim can either present direct evidence of discrimination, or can establish a prima facie case of discrimination under the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011).

Plaintiff makes no attempt to establish discrimination using the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*. Instead he offers "direct evidence of discrimination" in two forms: (1) conclusory statements that the Defendants acted with discriminatory purpose or racial animus; or (2) statements from a particular Defendant that use racial slurs or racially-charged language or stereotypes. With respect to his conclusory statements, Plaintiff provides no specific factual allegations to support his contention. Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Plaintiff's allegations of racially inappropriate statements, however, require deeper scrutiny.

Plaintiff alleges that Defendant Wilson acted with racially discriminatory purpose when he shook down Plaintiff's cell on March 23, 2013, and destroyed Plaintiff's legal documents in the process. Plaintiff supports the allegations with a quote from Defendant Wilson that includes

a racial slur.[10] (ECF No. 1-1, PageID.35.)  A prison official's use of racial epithets is unprofessional

and highly reprehensible, and it deserves the Court's strongest condemnation.  But an allegation that

a prison official used racial slurs, standing alone, does not violate the Fourteenth Amendmen''s

guarantee of equal protection. *See Taylor v. City of Falmouth,* 187 Fed. App'x. 596, 601 (6th Cir.

2006); *King v. City of Eastpointe,* 86 Fed. App'x. 790, 814 (6th Cir. 2003) (Moore, J., concurring

in part and dissenting in part); *Owens v. Johnson*, No. 99–2094, 2000 WL 876766, at *2 (6th Cir.

June 23, 2000) ("The occasional or sporadic use of racial slurs, although unprofessional and

reprehensible, does not rise to a level of constitutional magnitude."); *Williams v. Kaufman County*,

352 F.3d 994, 1013 & n. 61 (5th Cir. 2003).  Here, Plaintiff links the discriminatory purpose

evidenced by the racial slur with destruction of his legal papers in potential violation of his right to

due process under the Fourteenth Amendment and right to access the courts under the First

Amendment.  Accordingly, his allegations suffice to state an equal protection claim for the March

23, 2013 conduct of Defendant Wilson.

Plaintiff also alleges that on April 20, 2013, after Plaintiff fell in the shower,

Defendants Wilson and John Does ## 1-3 told racial jokes as they waited for health services to assist

Plaintiff.  (ECF No. 1-1, PageID.69-79.)  Plaintiff indicates that Defendants thereby displayed their

racial motivation for refusing to pick him up off the floor.  Plaintiff ignores, however, his further

allegation that Defendant Murry, their superior, ordered these Defendants to leave Plaintiff on the

floor pending her review of the video of Plaintiff's fall and her contact with health services.  (ECF

No. 1-1, PageID.69-70.)  Put differently, the decision-maker was Defendant Murry.  Plaintiff has

---

[10]Plaintiff also alleges that Defendant J. Smith used a racial slur when he spoke with Plaintiff on July 24, 2013 (ECF No. 1-2, PageID.114-115), but Plaintiff does not contend that racial animus motivated any particular action by Defendant J. Smith.

offered no evidence of her discriminatory animus or intent.  *See Umani*, 432 Fed. Appx. at 459 ("[T]o qualify as direct evidence of discriminatory intent, [the statement] must have been made by a person with decision-making authority.")  Plaintiff's allegations do not suffice to state an equal protection claim with respect to the Defendants' conduct on April 20, 2013.

2.    Due Process

"The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law." *Bazetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). To establish a Fourteenth Amendment procedural due process violation, a plaintiff must show that one of these interests is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  Analysis of a procedural due process claim involves two steps:  "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). For the most part, Plaintiff's claims fail at the first step.

a.    Deprivation of property

Plaintiff alleges that he was deprived of property without due process of law when Defendant Wilson destroyed his legal papers on March 23, 2013, and when Defendants Kerr, Day, and John Doe ## 6 and 7 shook down Plaintiff's cell and took five pieces of paper.  In both instances, the deprivation of Plaintiff's property occurred without notice, an opportunity to be heard, or any process at all.  Nonetheless, Plaintiff's claim fails because it is barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986).

-27-

Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy.  If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537.  This rule applies to both negligent and intentional deprivations of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984).  Because Plaintiff's claim is premised upon allegedly unauthorized acts of a state official, he must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993).  Under settled Sixth Circuit authority, a prisoner's failure to sustain this burden requires dismissal of his § 1983 due-process action. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Plaintiff has not sustained his burden in this case.  Plaintiff has not alleged that state post-deprivation remedies are inadequate.  Moreover, numerous state post-deprivation remedies are available to him.  First, a prisoner who incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation. MICH. DEP'T OF CORR., Policy Directive 04.07.112, ¶ B (effective Dec. 12, 2013).  Aggrieved prisoners may also submit claims for property loss of less than $1,000 to the State Administrative Board. MICH. COMP. LAWS § 600.6419; MDOC Policy Directive 03.02.131 (effective Oct. 21, 2013).  Alternatively, Michigan law authorizes actions in the Court of Claims asserting tort or contract claims "against the state and any of its departments, commissions, boards, institutions, arms, or agencies." MICH. COMP. LAWS § 600.6419(1)(a).  The Sixth Circuit specifically has held that Michigan provides adequate post-deprivation remedies for deprivation of property. *See Copeland*, 57 F.3d at 480.  Plaintiff does not allege any reason why a

-28-

state-court action would not afford him complete relief for the deprivation, either negligent or intentional, of his personal property. Accordingly, his due process claim relating to deprivations of papers will be dismissed.

### b.      Misconduct hearings

Plaintiff alleges that several Defendants denied him due process in connection with misconduct tickets and hearings. A prisoner's ability to challenge a prison misconduct conviction depends on whether the convictions implicated any liberty interest. A prisoner does not have a protected liberty interest in prison disciplinary proceedings unless the sanction "will inevitably affect the duration of his sentence" or the resulting restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin v. Conner*, 515 U.S. 472, 486-87 (1995).

Under Michigan Department of Corrections Policy Directive 03.03.105, ¶ B, a Class I misconduct is a "major" misconduct and Class II and III misconducts are "minor" misconducts. The policy further provides that prisoners are deprived of good time or disciplinary credits only when they are found guilty of a Class I misconduct. (*See* Policy Directive 03.03.105, ¶ AAAA). Plaintiff should not have been denied good time or disciplinary credits as a result of his Class II misconduct convictions. The Sixth Circuit routinely has held that misconduct convictions that do not result in the loss of good time are not atypical and significant deprivations and therefore do not implicate due process. *See, e.g., Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003); *Green v. Waldren*, No. 99-1561, 2000 WL 876765, at *2 (6th Cir. June 23, 2000); *Staffney v. Allen*, No. 98-1880, 1999 WL 617967, at *2 (6th Cir. Aug.

12, 1999). Plaintiff, therefore, fails to state a due process claim arising from his Class II misconduct convictions.

Plaintiff also alleges a denial of due process in connection with Class I misconducts. Again, he fails to state a due process claim.  In the seminal case in this area, *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Court prescribed certain minimal procedural safeguards that prison officials must follow before depriving a prisoner of good-time credits on account of alleged misbehavior.  The *Wolff* Court did not create a free-floating right to process that attaches to all prison disciplinary proceedings; rather the right to process arises only when the prisoner faces a loss of liberty, in the form of a longer prison sentence caused by forfeiture of good-time credits:

> It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison.  But here the State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior.  Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest."  But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

*Wolff*, 418 U.S. at 557 (citations omitted).

The Sixth Circuit has examined Michigan statutory law, as it relates to the creation and forfeiture of disciplinary credits[11] for prisoners convicted for crimes occurring after April 1, 1987.  In *Thomas v. Eby*, 481 F.3d 434 (6th Cir. 2007), the court determined that loss of disciplinary credits does not necessarily affect the duration of a prisoner's sentence.  Rather, it merely affects

---

[11] For crimes committed after April 1, 1987, Michigan prisoners earn "disciplinary credits" under a statute that abolished the former good-time system.  MICH. COMP. LAWS § 800.33(5).

parole eligibility, which remains discretionary with the parole board.  481 F.3d at 440.  Building on this ruling, in *Nali v. Ekman*, 355 F. App'x 909 (6th Cir. 2009), the court held that a misconduct citation in the Michigan prison system does not affect a prisoner's constitutionally protected liberty interests, because it does not necessarily affect the length of confinement.  355 F. App'x at 912; *accord, Wilson v. Rapelje*, No. 09-13030, 2010 WL 5491196, at * 4 (E.D. Mich. Nov. 24, 2010) (Report & Recommendation) (holding that "plaintiff's disciplinary hearing and major misconduct sanction does not implicate the Fourteenth Amendment Due Process Clause"), *adopted as judgment of court*, 2011 WL 5491196 (Jan. 4, 2011).  In the absence of a demonstrated liberty interest, Plaintiff has no due-process claim based on the loss of disciplinary credits.  *See Bell v. Anderson*, 301 F. App'x 459, 461-62 (6th Cir. 2008).

Even in the absence of a protectible liberty interest in disciplinary credits, a prisoner may be able to raise a due-process challenge to prison misconduct convictions that result in a significant, atypical deprivation.  *See Sandin*, 515 U.S. at 472; *see also Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004) (holding that unless a prison misconduct conviction results in an extension of the duration of a prisoner's sentence or some other atypical hardship, a due-process claim fails).  Plaintiff has not identified any significant deprivation arising from his misconduct convictions.  Accordingly, he fails to state a viable due process claim.

c.    STG designation, programs and transfer

The Supreme Court has held that a prisoner does not have a protected liberty interest in the procedures affecting his classification and security because the resulting restraint does not impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.  In *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91(6th Cir. 1995),

the Sixth Circuit applied the *Sandin* test to the claim of a Michigan inmate that the mandatory language of the MDOC's regulations created a liberty interest that he receive notice and hearing before being placed in administrative segregation.  The court held that regardless of the mandatory language of the prison regulations, the inmate did not have a liberty interest because his placement in administrative segregation did not constitute an atypical and significant hardship within the context of his prison life.  *Id; see also Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir. 1997).  Without a protected liberty interest, plaintiff cannot successfully claim that his due process rights were violated because, "[p]rocess is not an end in itself."  *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983).

Moreover, the Supreme Court repeatedly has held that a prisoner has no constitutional right to be incarcerated in a particular facility or to be held in a specific security classification.  *See Olim*, 461 U.S. at 245; *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Meachum v. Fano*, 427 U.S. 215, 228-29 (1976).  The Sixth Circuit has followed the Supreme Court's rulings in a variety of security classification challenges.  *See, e.g., Harris v. Truesdell*, 79 F. App'x 756, 759 (6th Cir. 2003) (holding that prisoner had no constitutional right to be held in a particular prison or security classification); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003) (same); *O'Quinn v. Brown*, No. 92-2183, 1993 WL 80292, at *1 (6th Cir. Mar. 22, 1993) (prisoner failed to state a due process or equal protection claim regarding his label as a "homosexual predator" because he did not have a constitutional right to a particular security level or place of confinement).  Plaintiff's designation as a "Security Threat Group Member" is nothing more than a security classification used by the prison.  Because Plaintiff does not have a constitutional right to a particular security level or classification, he fails to state a due process claim.

Federal courts consistently have found that prisoners have no constitutionally protected liberty interest in prison vocational, rehabilitation, and educational programs based on the Fourteenth Amendment.  *See, e.g., Moody*, 429 U.S. at 88 n.9 (Due Process Clause not implicated by prisoner classification and eligibility for rehabilitative programs, even where inmate suffers "grievous loss"); *Argue v. Hofmeyer*, 80 F. App'x 427, 429 (6th Cir. 2003) (prisoners have no constitutional right to rehabilitation, education or jobs); *Canterino v. Wilson*, 869 F.2d 948, 952-54 (6th Cir. 1989) (no constitutional right to rehabilitation); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (no constitutional right to prison employment); *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) ("[N]o prisoner has a constitutional right to a particular job or to any job"); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (participation in a rehabilitative program is a privilege that the Due Process Clause does not guarantee); *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985) (no constitutional right to rehabilitative services).  Thus, Plaintiff has no liberty interest in any rehabilitative program.

### d.    Other due process claims

Plaintiff raises other due process claims that are also meritless.  He claims that Defendant Murry denied his due process rights when she "falsified" the incident report.  Plaintiff claims Defendant Woods violated his due process rights when she required him to remove his coat and lift his shirt.  Plaintiff contends that Defendants Shroad and LaBarre denied his due process rights when they would not permit him to take his meals in his cell after he fell in the shower and required that he wear his sling outside his shirt.  Plaintiff alleges that Defendant Moul denied Plaintiff's due process rights when he refused Plaintiff recreational yard time and showers.  None

of the interests Plaintiff references are life, liberty or property interests entitled to due process protections.

>G.     Eighth Amendment

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes.  Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency."  *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981).  The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain."  *Ivey*, 832 F.2d at 954 (per curiam) (quoting *Rhodes*, 452 U.S. at 346).  The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities."  *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement."  *Rhodes*, 452 U.S. at 348 (citation omitted).  Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."  *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety."  *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).  "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'"  *Hudson v. McMillian*,

503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347).  As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim."  *Id.*

    1.    General conditions

Plaintiff contends that Defendants subjected him to cruel and unusual punishment through verbal harassment, sexual harassment, false misconducts, and threats of inciting violent action by other inmates against Plaintiff.

    a.    Verbal harassment

The use of harassing or degrading language by a prison official, although unprofessional and deplorable, does not rise to constitutional dimensions.  *See Ivey*, 832 F.2d at 954-55; *see also Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (harassment and verbal abuse do not constitute the type of infliction of pain that the Eighth Amendment prohibits); *Violett v. Reynolds,* No. 02-6366, 2003 WL 22097827, at *3 (6th Cir. Sept. 5, 2003) (verbal abuse and harassment do not constitute punishment that would support an Eighth Amendment claim); *Thaddeus-X v. Langley*, No. 96-1282, 1997 WL 205604, at *1 (6th Cir. Apr. 24, 1997) (verbal harassment is insufficient to state a claim); *Murray v. U.S. Bureau of Prisons*, No. 95-5204, 1997 WL 34677, at *3 (6th Cir. Jan. 28, 1997) ("Although we do not condone the alleged statements, the Eighth Amendment does not afford us the power to correct every action, statement or attitude of a prison official with which we might disagree."); *Clark v. Turner*, No. 96-3265, 1996 WL 721798, at *2 (6th Cir. Dec. 13, 1996) ("Verbal harassment and idle threats are generally not sufficient to constitute an invasion of an inmate's constitutional rights.");  *Brown v. Toombs*, No. 92-1756, 1993 WL 11882 (6th Cir. Jan. 21, 1993) ("Brown's allegation that a corrections officer used derogatory language and insulting racial epithets is insufficient to support his claim under the Eighth

Amendment.").  Even the occasional or sporadic use of racial slurs, although unprofessional and reprehensible, does not rise to a level of constitutional magnitude.  *See Torres v. Oakland Cty.*, 758 F.2d 147, 152 (6th Cir. 1985).   Accordingly, Plaintiff fails to state an Eighth Amendment claim against Defendants arising from his alleged verbal abuse.

b. Sexual harassment

Plaintiff alleges that he was sexually harassed by Defendant Woods on March 31, 2013, when she required Plaintiff to unzip his coat and lift his shirt, and by Defendant Wilson on May 22, 2013, when Defendant Wilson fondled and squeezed Plaintiff's buttocks during a shake down.  Circuit courts consistently have held that sexual harassment, absent contact or touching, does not satisfy the objective requirement because such conduct does not constitute the unnecessary and wanton infliction of pain.  *See Morales v. Mackalm*, 278 F.3d 126, 132 (2d Cir. 2002) (allegations that prison guard asked prisoner to have sex with her and to masturbate in front of her and other female staffers did not rise to level of Eighth Amendment violation); *Barney v. Pulsipher*, 143 F.3d 1299, 1311 n.11 (10th Cir. 1998) (allegations that county jailer subjected female prisoners to severe verbal sexual harassment and intimidation was not sufficient to state a claim under the Eighth Amendment); *Howard v. Everett*, No. 99-1277EA, 2000 WL 268493, at *1 (8th Cir. March 10, 2000) (sexual comments and gestures by prison guards did not constitute unnecessary and wanton infliction of pain); *cf. Seltzer-Bey v. Delo*, 66 F.3d 961, 962-63 (8th Cir. 1995) (allegations that prison guard conducted daily strip searches, made sexual comments about prisoner's penis and buttocks, and rubbed prisoner's buttocks with nightstick were sufficient to withstand motion for summary judgment); *Zander v. McGinnis*, No. 97-1484, 1998 WL 384625, at *2 (6th Cir. June 19, 1998) (verbal abuse of mouthing "pet names" at prisoner for ten months failed to state an Eighth

Amendment claim); *Murray v. United States Bureau of Prisons*, No. 95-5204, 1997 WL 34677, at

*3 (6th Cir. Jan. 28, 1997) (magistrate judge correctly held that verbal abuse in the form of offensive

remarks regarding a transsexual prisoner's bodily appearance, transsexualism, and presumed sexual

preference cannot state an Eighth Amendment claim).  Some courts have held that even minor,

isolated incidents of sexual touching coupled with offensive sexual remarks do not rise to the level

of an Eighth Amendment violation.  *See, e.g., Solomon v. Mich. Dep't of Corr.*, 478 F. App'x 318,

320-21 (6th Cir. 2012) (two "brief" incidents of physical contact during pat-down searches,

including touching and squeezing the prisoner's penis, coupled with sexual remarks, do not rise to

the level of a constitutional violation); *Jackson v. Madery,* 158 F. App'x 656, 661 (6th Cir. 2005)

(correction officer's conduct in allegedly rubbing and grabbing prisoner's buttocks in degrading

manner was "isolated, brief, and not severe" and so failed to meet Eighth Amendment standards);

*Johnson v. Ward*, No. 99-1596, 2000 WL 659354, at *1 (6th Cir. May 11, 2000) (male prisoner's

claim that a male officer placed his hand on the prisoner's buttock in a sexual manner and made an

offensive sexual remark did not meet the objective component of the Eighth Amendment); *Berryhill*

*v. Schriro*, 137 F.3d 1073, 1075 (8th Cir. 1998) (where inmate failed to assert that he feared sexual

abuse, two brief touches to his buttocks could not be construed as sexual assault); *accord Boxer X*

*v. Harris,* 437 F.3d 1107, 1111 (11th Cir. 2006); *Boddie v. Schneider*, 105 F.3d 857, 859-61 (2d Cir.

1997) (court dismissed as inadequate prisoner's claim that female corrections officer made a pass

at him, squeezed his hand, touched his penis, called him a "sexy black devil," pressed her breasts

against his chest, and pressed against his private parts).  If true, the conduct of Defendants Woods

and Wilson toward Plaintiff was reprehensible, but it does not rise to the level of an Eighth

Amendment violation.

c.      False misconducts

Plaintiff alleges that several Defendants violated the Eighth Amendment when they wrote or facilitated false misconduct tickets against Plaintiff.  The Sixth Circuit has held that the filing of a false misconduct report does not constitute punishment under the Eighth Amendment. *See Williams v. Reynolds*, 198 F.3d 248 (6th Cir. 1999) (unpublished table decision) ("neither verbal harassment or threats nor the filing of a false misconduct report constitute punishment within the context of the Eighth Amendment") (citing *Ivey*, 832 F.2d at 955, and *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir.1986)); *see also Bruggeman v. Paxton*, 15 F. App'x 202, 205 (6th Cir.2001) (a prisoner's claim that he was punished on the basis of a false misconduct report fails to state an Eighth Amendment claim). Plaintiff therefore fails to state an Eighth Amendment claim for the false misconduct reports.

d.      Denial of showers

Plaintiff's claim that he was denied the opportunity to shower on a few occasions does not rise to the level of cruel and unusual punishment.  "[D]eprivation of a shower and other personal hygiene items for a 'brief span of time . . . , i.e., only six days' is not actionable conduct." *Richmond v. Settles*, 450 Fed. Appx. 448, 455 (6th Cir. 2011) (citing *Siller v. Dean*, No. 99-5323, 2000 WL 145167 at *2 (6th Cir. Feb. 1, 2000)).  Plaintiff's allegations show that he was only sporadically denied the opportunity to shower.

e.      Denial of exercise or yard time

Similarly, with regard to Plaintiff's exercise claims, the Court notes that Eighth Amendment standards entitle prisoners to exercise sufficient to maintain reasonably good physical and mental health.  *See Walker v. Mintzes*, 771 F.2d 920-927 (6th Cir. 1985).  Plaintiff is entitled

-38-

to no more than the "the 'minimal civilized measure of life's necessities[,]'" with respect to yard or exercise time.  *Id.* at 927 (citing *Rhodes*, 452 U.S. at 351). Plaintiff's allegations show only a sporadic denial of yard time and, therefore, do not rise to the level of a constitutional violation.

                  f.      Threats to incite prisoner violence

Plaintiff claims that several Defendants threatened to incite other prisoners to harm Plaintiff.  Inmates have a constitutionally protected right to personal safety grounded in the Eighth Amendment. *Farmer*, 511 U.S. at 833.  Thus, prison staff are obliged "to take reasonable measures to guarantee the safety of the inmates" in their care. *Hudson*, 468 U.S. at 526-27.  To establish a violation of this right, Plaintiff must show that Defendant was deliberately indifferent to the Plaintiff's risk of injury. *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990); *McGhee v. Foltz*, 852 F.2d 876, 880-81 (6th Cir. 1988).  While a prisoner does not need to prove that he has been the victim of an actual attack to bring a personal safety claim, he must at least establish that he reasonably fears such an attack. *Thompson v. Cty. of Medina*, 29 F.3d 238, 242-43 (6th Cir. 1994) (holding that plaintiff has the minimal burden of "showing a sufficient inferential connection" between the alleged violation and inmate violence to "justify a reasonable fear for personal safety.")

Plaintiff has failed to allege any facts showing he was ever in a position to fear for his safety.  Plaintiff does indicate that the Defendants called Plaintiff a "rat" or "snitch."  (ECF No. 1, PageID.21; ECF No. 1-1, PageID.38, 48, 50-51; ECF No. 1-2, PageID.94, 112-113, 115, 133-134, 139.)  In each instance, however, the statements clearly reveal that Defendants called Plaintiff those names because he "ratted" or "snitched" on the Defendants, not other prisoners.  Moreover, Plaintiff does not allege that any other prisoner heard the statements.  Indeed, Plaintiff does not allege that

he had a reasonable fear of inmate violence.  Therefore he has failed to state an Eighth Amendment claim with respect to Defendants' threats.

### 2.      Failure to treat Plaintiff's shoulder injury

The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency.  *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976).  The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer*, 511 U.S. at 834.  To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Id.*  The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person."  *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004).  If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore*, 390 F.3d at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care."  *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834).  Deliberate indifference "entails something more

-40-

than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment,

-41-

federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Rouster v. Saginaw Cnty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland County*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2013) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).

a.      Failure to treat claims against corrections officers

Plaintiff claims that several corrections officers were deliberately indifferent to his serious medical needs. On March 2, 2013, after Plaintiff suffered his shoulder injury, he approached Defendant DeBor on the yard seeking assistance. She sent him inside to seek assistance. He returned shortly thereafter because Defendant Wilson refused to contact health services. Defendant DeBor closed the yard and contacted health services on Plaintiff's behalf. Plaintiff's allegations are insufficient to establish any indifference to Plaintiff's serious medical need by Defendant DeBor. With respect to Defendant Wilson, however, Plaintiff has sufficiently alleged deliberate indifference to his serious medical need.

Plaintiff alleges that Defendants Mygrant and Baitenger exhibited deliberate indifference to Plaintiff's serious medical need when they informed the hospital healthcare providers that the arm brace proposed by Defendant Lane would not be permitted in ICF. Plaintiff was provided a sling in its place. Thus, Plaintiff was not entirely denied medical care, he simply

-42-

contends that the sling was not as good as a brace, that it was somehow inadequate treatment. With respect to Defendants Mygrant and Baitenger, therefore, Plaintiff has failed to state a claim for violation of the Eighth Amendment.

Plaintiff asserts that Defendant Houser was deliberately indifferent to Plaintiff's serious medical needs on March 26, 2013. Plaintiff's description of Defendant Houser's conduct, however, discloses otherwise. Plaintiff complained to Houser about pain on three occasions on March 26. Defendant Houser called health services three times on Plaintiff's behalf. Defendant Houser was told that health services was aware of Plaintiff's injury, had provided Plaintiff something for pain, they could do nothing more for him, and he was scheduled to see the doctor soon. Defendant Houser communicated that information to Plaintiff. Plaintiff has failed to allege facts sufficient to show that Defendant Houser was deliberately indifferent to Plaintiff's serious medical needs.

Plaintiff asserts that Defendant Day was deliberately indifferent to Plaintiff's serious medical need on March 27, 2013. On that date, Plaintiff complained to Defendant Day that Plaintiff was in pain and need medical care. Defendant Day refused to contact health services for Plaintiff unless Plaintiff were "dying or dead." (ECF No. 1-1, PageID.41.) Plaintiff's allegations against Defendant Day suffice to state a claim for deliberate indifference to Plaintiff's serious medical need.

Plaintiff claims that Defendant Shroad was deliberately indifferent to Plaintiff's serious medical need on April 19, 2013. On that date Defendant Shroad informed Plaintiff that he would have to wear the sling outside of his outer layer of clothing (shirt or coat). Plaintiff notes, however, that Defendant Shroad informed Plaintiff that Shroad had contacted Defendant Nurse LaBarre to make sure there would be no problem with Plaintiff wearing the sling outside his clothes.

-43-

Defendant LaBarre informed Defendant Shroad that the proposal would be acceptable.  Plaintiff's claim that Defendant Shroad was deliberately indifferent to Plaintiff's serious medical need is without merit where Defendant Shroad acted with the advice and approval of a healthcare professional.

Plaintiff claims that Defendants Murry, Wilson, and John Doe #1, #2, and #3 were deliberately indifferent to his medical needs when they would not assist him up from the shower floor when he fell on April 20, 2013.  At the direction of Defendant Murry, Defendants Wilson and John Doe #1, #2, and #3, left Plaintiff on the shower floor complaining of shoulder and back pain while Defendant Murry checked the video of Plaintiff's fall and contacted health services. Defendant Nurse Siglar arrived, according to Plaintiff's estimate  between thirty minutes and sixty minutes after he had fallen. After Defendant Siglar examined Plaintiff, he was transported to the hospital where he received care in the emergency room.[12]

The delay of 30 to 60 minutes before being examined by a healthcare professional is objectively not unreasonable.  *See Hubbard v. Gross*, 199 Fed. App'x 433, 438 (6th Cir. 2006) (where broken hand was treated after a two-hour delay the court stated: "Although, Hubbard's broken and swollen hand was 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention,' Hubbard did not demonstrate that his 'need was not addressed within a reasonable time frame.' Hubbard cannot satisfy the objective prong of the deliberate indifference analysis.") (citations and footnote omitted); *Portis v. Caruso*, No. 1:07-cv-970, 2007 WL 4465220, at *4 (W.D. Mich. Dec. 17, 2007) ("[T]he condition of confinement must be one that society

---

[12]Plaintiff identifies Defendants Baitenger and Santiago-Davis as the corrections officers that transported Plaintiff to the hospital.  He makes no further allegations with regard to their conduct in connection with the April 20 incident. Plaintiff has failed to state a claim for violation of the Eighth Amendment against Defendants Baitenger and Santiago-Davis.

'chooses not to tolerate.' A one-hour delay in receiving medical treatment for a fractured finger falls far short of this objective standard."); *Weatherspoon v. Woods*, No. 2:14-cv-142, 2016 WL 737778, at \*5 (W.D. Mich. Feb. 25, 2016) ("Overall the medical evidence clearly indicates that Plaintiff was not suffering from a serious injury that could have worsened due to an hour delay in treatment . . . . As a result Plaintiff has not satisfied the objective component of his Eighth Amendment claim.").

The medical record submitted by Plaintiff indicates that he suffered only a coccygeal bruise. The hospital's recommended treatment was Tylenol. Plaintiff's need for treatment was not sufficiently serious, and the short delay did not operate to his detriment. Plaintiff has failed to state a claim for violation of the Eighth Amendment with respect to the Defendants' response to his fall in the shower.

b.      "Failure to treat" claims against health care providers

Plaintiff alleges that Defendants Kennerly, Czop, Gerlach, Behler, LaBarre, Jastifer, Bounting, Kemp, Siglar, and Ibarra from the ICF health services unit as well as Corizon and its health care providers Dr. Harriet Squier, Dr. Erin Orlebeke, and Dr. Timothy Kangas were all deliberately indifferent to his shoulder injury. Plaintiff's allegations and the the medical record reveal that Plaintiff received treatment for his shoulder injury. The allegations and the medical record further indicate, however, that the treatment may have been "'so woefully inadequate as to amount to no treatment at all.'" *Mitchell*, 553 F. App'x at 605. Accordingly, Plaintiff has stated a claim for violation of the Eighth Amendment against these Defendants.

H.      First Amendment

Plaintiff complains that his First Amendment rights have been violated in many respects: Plaintiff claims his right to free speech was violated when Defendant Murry rewrote the critical incident report regarding Plaintiff's fall in the shower; Plaintiff claims his rights to free speech and to access the courts were violated when he was prohibited from using the telephones on the yard on different occasions; and Plaintiff claims his right to petition for redress of grievances was violated when Defendant Novack interfered with Plaintiff's typing of grievances in the library and when several Defendants retaliated against him for filing grievances.

1.      Free speech

The First Amendment prohibits states from "abridging the freedom of speech." U.S. CONST. amend. I.  While inmates retain certain constitutional rights, prison officials may impinge on these constitutional rights if the regulation "is reasonably related to legitimate penological interests."  *See Turner*, 482 U.S. at 89.  To determine whether a prison official's actions are reasonably related to a legitimate penological interest, the Court must assess an official's actions by reference to the following factors: (1) whether there exists a valid, rational connection between the prison regulation and the legitimate governmental interest; (2) whether there remain alternative means of exercising the right; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.  *Turner*, 482 U.S. at 89-90.  Moreover, as continually emphasized by the Supreme Court, the problems of prison administration are peculiarly for resolution by prison authorities and their resolution should be accorded deference by the courts.

-46-

*See Turner*, 482 U.S. at 84-96; *Washington v. Harper*, 494 U.S. 210, 224 (1990); *O'Lone*, 482 U.S. at 349; *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125-126 (1977).  These concerns are even stronger when a state penal institution is involved.  *Glover v. Johnson*, 138 F.3d 229, 241 (6th Cir. 1998).

Applying this standard, the Supreme Court has upheld a variety of limitations on First Amendment protections.  *See Shaw v. Murphy*, 532 U.S. 223, 229 (2001) (holding that prisoners do not have a First Amendment right to provide legal assistance to other prisoners) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (sustaining proscriptions on media interviews)); *Thornburgh v. Abbott*, 490 U.S. 401, 419 (1989) (applying *Turner* standard to a prison ban on certain publications); *Turner*, 482 U.S. at 93 (restricting inmate-to-inmate correspondence).  *See also North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. at 133 (upholding ban on prisoner labor unions). The free speech rights of prisoners "are uncontrovertedly limited by virtue of their incarceration." *Thaddeus-X v. Blatter*, 175 F.3d 378, 392 (6th Cir.1999).

With respect to the critical incident report, the report is required by Michigan Department of Corrections Policy Directive 01.05.120.  The policy directive identifies the purpose of the report as providing information regarding important incidents to administrators.  It is focused on the occurrence of assaults and injuries.  There is nothing in the policy directive to suggest that the critical incident report is intended as a reporting device for improper conduct by corrections officers (unless that conduct constitutes an assault or results in a serious physical injury).  The device for reporting violations of policy or procedure by corrections officers for the purpose of seeking redress is the grievance procedure provided by Michigan Department of Corrections Policy Directive 03.02.130.

Plaintiff acknowledges that he was provided and availed himself of the opportunity to raise by grievance the matters that had been removed from the critical incident report.  "A prisoner's constitutional right to assert grievances typically is not violated when prison officials prohibit only 'one of several ways in which inmates may voice their complaints to, and seek relief, from prison officials' while leaving a formal grievance procedure intact." *Griffin v. Berghuis*, 563 Fed. App'x 411, 415-416 (6th Cir. 2014) (citing *North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. at 130 n. 6).  Under the circumstances, despite Plaintiff's conclusory allegation to the contrary, Defendant Murry's actions were reasonably related to the legitimate penological interests expressly stated in the policy directives.

With respect to restriction of Plaintiff's speech with his uncle, "federal court opinions have previously held that persons incarcerated in penal institutions retain their First Amendment rights to communicate with family and friends, . . . [n]evertheless, an inmate has no right to unlimited telephone use." *Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir. 1994).  Moreover, the institution may place limits on communication and/or visitation if such limits are necessary to meet legitimate penological objectives, such as rehabilitation and the maintenance of security and order. *See Overton v. Bazzetta*, 539 U.S. 126 (2003) (withdrawing visitation privileges for a period of time to effect prison discipline is not a dramatic departure from accepted standards for conditions of confinement).

Here, Plaintiff has not asserted any facts tending to show that the temporary restrictions on his use of the yard or use of the telephones on the yard are not related to legitimate penological interests, i.e., discipline for violation of prison rules.  Moreover, in light of his alternative means of communication, namely written correspondence, these temporary sanctions

imposed as legitimate sanctions in response to a disciplinary proceeding do not violate Plaintiff's First Amendment speech or association rights.

2.      Access to the courts

According to Plaintiff, Defendants' interference with Plaintiff's ability to communicate with his uncle, an attorney, violated Plaintiff's First Amendment right to access the courts.  It is clearly established that prisoners have a constitutionally protected right of access to the courts under the First and Fourteenth Amendments.  *See Lewis v. Casey*, 518 U.S. 343, 354 (1996); *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Wolff*, 418 U.S. at 556.  Prison officials have a two-fold duty to protect a prisoner's right of access to the courts.  *McFarland v. Luttrell*, No. 94-6231, 1995 WL 150511, at *3 (6th Cir. Apr. 5, 1995).  First, they must provide affirmative assistance in the preparation of legal papers in cases involving constitutional rights, in particular criminal and habeas corpus cases, as well as other civil rights actions relating to the prisoner's incarceration.  *Id.* (citing *Bounds*, 430 U.S. at 824-28).  Second, the right of access to the courts prohibits prison officials from erecting any barriers that may impede the inmate's accessibility to the courts.  *Id.* (citing *Knop v. Johnson*, 977 F.2d 996, 1009 (6th Cir. 1992)); *see also Bounds*, 430 U.S. at 822 (citing *Ex parte Hull*, 312 U.S. 546, 549 (1941)).  In order to state a viable claim for interference with his access to the courts, a plaintiff must show actual injury to pending or contemplated litigation.  *See Lewis*, 518 U.S. at 349; *Dellis*, 257 F.3d at 511; *Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop*, 977 F.2d at 1000.

In addition, the Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation."  *Christopher v. Harbury*, 536 U.S. 403, 415

-49-

(2002) (citing *Lewis*, 518 U.S. at 353 & n.3). "Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Id.* at 416. Plaintiff has not identified any underlying cause of action or lost remedy resulting from his sporadic inability to speak with his uncle by telephone. Accordingly, Plaintiff has failed to state a claim for violation of his right to access the courts.

### 3.    Retaliation

Plaintiff contends that several of the Defendants have violated Plaintiff's First Amendment right to petition for redress by retaliating against him for filing grievances. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X*, 175 F.3d at 394. In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The filing of a prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation. *See Smith*, 250 F.3d at 1037; *Hall v. Nusholtz*, No. 99-2442, 2000 WL 1679458, at *2 (6th Cir. Nov. 1, 2000); *Burton v. Rowley*, No. 00-1144, 2000 WL 1679463, at *2 (6th Cir. Nov. 1, 2000). In much the same way that Plaintiff asserts that each

Defendant's actions were racially discriminatory he conclusorily asserts that the actions were retaliatory for his filing of grievances.

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence.  *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987); *Vega v. DeRobertis*, 598 F. Supp. 501, 506 (C.D. Ill. 1984), *aff'd*, 774 F.2d 1167 (7th Cir. 1985).  "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez*, 826 F.2d at 1538-39); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.");  *Skinner v. Bolden*, 89 F. App'x 579, 579-80 (6th Cir. 2004) (without more, conclusory allegations of temporal proximity are not sufficient to show a retaliatory motive).  In many instances Plaintiff merely alleges the ultimate fact of retaliation, he has not presented any facts to support his conclusion that Defendants retaliated against him because he filed a grievance.  Those speculative allegations fail to state a claim.

With regard to certain Defendants, however, Plaintiff has alleged facts showing a retaliatory motive:

- Plaintiff alleges that on March 2, 2013, when Defendant Wilson refused to contact healthcare services on Plaintiff's behalf, Wilson made specific reference to Plaintiff having sent a kite to the warden regarding Wilson's conduct.  (ECF No. 1, PageID.21.)

- Plaintiff alleges that on March 24, 2013, when Defendant Murry denied him time in the yard and a shower.  Plaintiff alleges that Murry expressly attributed the denial to Plaintiff's filing of a grievance against Defendant Wilson.  (ECF No. 1-1, PageID.38.)

-51-

•       Plaintiff alleges that Defendants Wilson, Murry, Moul, Vankamann, and Bourman daily threatened to have other inmates harm Plaintiff because he was writing grievances.  (ECF No. 1-1, PageID.48.)

•       Plaintiff alleges that on March 31, 2013, Defendant Woods shook him down in a harassing and degrading way and threatened worse treatment if Plaintiff continued to write grievances on her friends.  (ECF No. 1-1, PageID.50.)

•       Plaintiff alleges that on April 19, 2013, Defendant Shroad required Plaintiff to wear his sling outside his shirt and coat, a more painful practice, because Plaintiff had written grievances on Defendant Shroad's staff.  (ECF No. 1-1, PageID.65.)

•       Plaintiff alleges that on April 20, 2013, Defendant Murry delayed contacting healthcare services after Plaintiff's fall.  According to Plaintiff, Defendant Murry informed Plaintiff that the delay was the result of Plaintiff writing grievances.  (ECF No. 1-1, PageID.74.)

•       Plaintiff alleges that on June 27, 2013, Defendant Harris threatened to deny Plaintiff yard time and write false misconduct reports on Plaintiff because Plaintiff had written grievances on Defendant Harris's friends.  (ECF No. 1-2, PageID.109.)

•       Plaintiff alleges that on July 5, 2013, Defendant Zwolensky threatened Plaintiff that he would not remain in general population if he continued to write grievances.  (ECF No. 1-2, PageID.113.)

•       Plaintiff alleges that during May of 2013, Defendant Day threatened Plaintiff that he would not remain in general population because he had gone over Day's head in complaining about Defendant Wilson.  (ECF No. 1-2, PageID.133.)

•       Plaintiff alleges that Defendant Nevins told Plaintiff he would be kept in STG status either because he filed a grievance against Nevins or contacted his supervisor.  (ECF No. 1-2, PageID.139.)

With respect to these Defendants, Plaintiff's allegations suffice to state the requisite retaliatory motive.  Moreover, at this stage of the proceeding, Plaintiff's allegations regarding the retaliatory acts taken or threatened are sufficiently adverse to support his retaliation claim.

4.      Use of a typewriter

Finally, Plaintiff complains that Defendant Novack interfered with his First Amendment rights when he told Plaintiff he could not use a typewriter to prepare grievances.  An inmate's filing of institutional grievances is constitutionally protected conduct under the first prong of *Thaddeus-X*, for which a prisoner may not be subjected to retaliation.  *See Shehee*, 199 F.3d at 300-301; *Scott v. Kilchermann*, No. 99-1711, 2000 WL 1434456, at *2 (6th Cir. Sept. 18, 2000)*; accord Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir.1996); *see also Herron v. Harrison*, 203 F.3d 410,  415 (6th Cir. 2000).  But the proscription against retaliation does not require state officials to promote the filing of grievances.  The Supreme Court has explored the limits of the state's obligation to assist prisoners in petitioning for redress of grievances with respect to the right of access to the courts.

The right of access to the courts recognized in *Bounds*, 430 U.S. at 817, requires states to provide prisoners some materials:  "paper and pen to draft legal documents, notarial services to authenticate them, and . . .  stamps to mail them." *Id.* at 824-25.  The required tools do not include a typewriter.  *See, i.e., Looper v. Gibson*, 63 Fed. App'x 877, 878 (6th Cir. 2003) (concluding that the refusal of the Tennessee Department of Correciton to provide the prisoner a typewriter has not prejudiced his ability to press his legal claims); *Inmates, Wash Cnty. Jail v. England*, 516 F.Supp. 132, 140 (E.D.Tenn.1980) ("An inmate has a constitutional right to have access to the courts, a right which includes the right to have paper, pens or pencils. However, that right does not include any constitutionally protected right to have the use of a typewriter. [cites omitted]"), *aff'd*, 659 F.2d 1081 (6th Cir. 1981) (without opinion); *Marcilis v. Bouck*, No. 92-1110, 1992 WL 139654, at *1 (6th Cir., June 22, 1992) ("[T]here were alternate avenues open to the

prisoner to provide him with adequate access to the courts and to file grievances within the prison, without the use of a typewriter."). If Plaintiff does possess a constitutional right to file a grievance, apart from a retaliation claim, Plaintiff has not established in this action that he was ever prevented from filing a grievance.  There is certainly no freestanding constitutional right to use a typewriter.

III.    Summary of remaining claims

As set forth in detail above, Plaintiff's complaint suffices to state the following claims:

1.    Plaintiff's claim that Defendant Wilson violated Plaintiff's right to equal protection on March 23, 2013.

2.    Plaintiff's claims that Defendant Wilson and Defendant Day, on March 2, 2013 and March 27, 2013 respectively, were deliberately indifferent to Plaintiff's serious medical need in violation of Plaintiff's Eighth Amendment rights.

3.    Plaintiff's claims that Defendants Kennerly, Czop, Gerlach, Behler, LaBarre, Jastifer, Bounting, Kemp, Siglar, Ibarra, Corizon, Squier, Orlebeke, and Kangas, were deliberately indifferent to Plaintiff's serious medical need in that their treatment of Plaintiff's shoulder injury was tantamount to no treatment at all, in violation of Plaintiff's Eighth Amendment rights.

4.    Plaintiff's claims that Defendants Wilson, Murry, Moul, Vankamman, Bourman, Woods, Shroad, Harris, Zwolensky, Day, and Nevins retaliated against Plaintiff, in violation of the First Amendment, for Plaintiff's exercise of his right to petition for redress of grievances.

The remaining claims in Plaintiff's complaint are properly dismissed.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Stoddard, Norwood, Huss, Cassel, Butler, King, Edwards, Zwicker, John Doe #1, John Doe #2, John Doe #3, J. Smith, Downing, DeBor, Mygrant, Santiago-Davis, Baitenger, Novack, Lane, Baden, (unknown) RN at Sparrow Ionia (Meshia), Stansby, Sparrow Ionia Hospital,

Roots, Guilkey, Preslesnik, Shecter, Roy, E. Smith, and Houser will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court will serve the complaint against Defendants Nevins, Murry,Wilson, Woods, Day,  Harris, Moul, Vankamann, Bourman, Shroad, Zwolensky, Corizon Healthcare Incorporated, Kennerly, Czop, Gerlach, Behler,  LaBarre, Jastifer, Bounting, Kemp, Siglar, Ibarra, Squier, Olebeke, and Kangas.

      An Order consistent with this Opinion will be entered.


Dated:  May 31, 2016                              /s/ Janet T. Neff
                                              Janet T. Neff
                                              United States District Judge